AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
| --- | --- | --- |

SAMRAH KAZMI

**SUMMONS IN A CIVIL ACTION**

V.

WACHOVIA SECURITIES, INC.

CASE NUMBER:

# 08 CV 1708

# JUDGE LYNCH

TO: (Name and address of Defendant)

Wachovia Securities, Inc.
Riverfront Plaza
901 East Byrd Street
Richmond, VA 23219

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Jenice L. Malecki, Esq.
Malecki Law
11 Broadway, Suite 715
New York, NY 10004

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                                    FEB 2 1 2008

CLERK          _Marcos Quintero_

(By) DEPUTY CLERK                                        DATE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMRAH KAZMI,

                              Plaintiff,

        - versus -

WACHOVIA SECURITIES INC.,

                              Defendants.

JUDGE LYNCH

08 CV 1708

Civil Action No.

**COMPLAINT**

DEMAND FOR A JURY TRIAL



FEB 2 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## I.    JURISDICTIONAL STATEMENT

1.    This action seeks compensatory, punitive and injunctive relief to redress harassment and discrimination against plaintiff Samrah Kazmi ("Kazmi") by Wachovia Securities, Inc. ("Wachovia") based upon Title VII of the Civil Rights Act of 1964 ("Title VII"), the Family Medical Leave Act ("FMLA"), New York State Executive Law ("Exec Law"), Human Rights Law ("HRL") and Civil Rights Law ("CRL"). Kazmi filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") and solicited a right to sue letter, which she received and is annexed as Exhibit A.

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sec. 1331 in that this is an action arises under federal question jurisdiction, as well as under 28 U.S.C. Secs. 1343a(3) and 1343a(4), being an action seeking redress for the violation of plaintiff's constitutional and civil rights.  The matter in controversy also exceeds, exclusive of interests and costs, the sum specified by 28 U.S.C. Sec. 1332.

3.    Plaintiff's claims for declaratory and injunctive relief is authorized by 28 U.S.C. Secs. 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

1

4.    The plaintiff further invokes this Court's pendant jurisdiction, pursuant to 28 U.S.C. Sec. 1367(a), over any and all state law claims and as against all parties that are so related to the claims in this action within the original jurisdiction of this Court that they are and form part of the same court or controversy.

5.    The plaintiff demands a trial by jury on each and every one of her claims as pleaded herein.

## II.    <u>VENUE</u>

6.    Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. Sec. 1391 (b) and (c).

## III.    <u>SUMMARY OF COMPLAINT</u>

7.    This is a proceeding to enforce Kazmi's rights as a member of a protected class, an employee and a permanent resident of the United States of America and the State of New York. This action arises out of the termination of Kazmi. Kazmi was an Associate in the Structured Asset Investors ("SAI") group with Wachovia Securities, Inc. ("Wachovia") and had worked with them in different capacities since December 1999 through October 17, 2006. Kazmi was a loyal, dedicated and trusted employee. Preceding Kazmi's termination, Wachovia made inappropriate comments indicating the discriminatory reason for termination and replaced her with a male colleague.

## IV.    <u>PARTIES</u>

### A.    **Plaintiff**

8.    At all times pertinent hereto, Kazmi has been and is a resident of the State of New York, County of New York. December 1999 through October 17, 2006, Kazmi was employed by Wachovia in the County of New York.

B.    **Defendants**

9.    At all times pertinent hereto, Defendant Wachovia has been a corporation organized under the laws of the State of Delaware with a place of business in the State of New York and offices in several counties. Wachovia is engaged in the business of selling investment products and providing financial services to its customers. Wachovia employs thousands of employees company-wide, meeting statutory minimums under Title VII and the FMLA, as well as NY Exec Law, HRL and CRL.

V.    **STATEMENT OF FACTS**

A.    **Kazmi was Subject to a Discriminatory Environment at Wachovia**

10.    Kazmi is a Pakistani-born, brown-skinned Asian female Muslim who was employed by Wachovia from December 1999 until October 17, 2006. She was discriminated and retaliated against because of her race, color, religion, sex and national origin.

11.    Kazmi's performance and evaluations were always good, if not excellent. At the time she was terminated, Kazmi had approximately a decade in the securities industry with clean multiple securities industry licenses.

12.    Kazmi has and had at all relevant times a Masters in Business Administration ("MBA").

13.    At the time Kazmi was terminated, she held the post of an "Associate" in the Structured Asset Investors' (SAI) group. This group was permitted by Wachovia to maintain a discriminatory environment.

14.    Kazmi joined the SAI group in August 2004 as an internal hire from another group at Wachovia in which she had been working at for 4.75 years at that time. Kazmi believed that she would advance her career by making the move, but just the opposite occurred.

15.    Although the new position was listed as an "analyst" or "associate" position, when she was hired her title included the words "First Year," the firm's lowest ranking. That "First Year" title Kazmi was given was

3

typical of an employee with no industry experience, a lack of licensing and/or graduate education, although Kazmi had a lot of experience and an MBA, as well as many licenses.

16. The low title also carried with it a smaller salary than that which she should have been earning.

17. Jeff Palmese and George Ene, both white Caucasian American males not Muslim, unlicensed and with limited industry experience, were in her department and hired as "Associates." The "Senior Analyst" title was also given to Matthew Fiordaliso, who also was a white Caucasian American male, not Muslim, who was an unlicensed fresh college graduate and had virtually no industry experience.

18. When Kazmi raised this issue with her white Caucasian American male supervisor James Burke ("Burke"), not a Muslim, he specifically stated to Kazmi that he was skeptical of "a woman who was mostly educated outside of the U.S." Kazmi was educated in Pakistan in a British convent through high school, then undergraduate at Boston University (Economics major, Journalism minor) in the United States and in graduate school at University of Southern Europe in the Principality of Monaco, all being English language based programs.

19. While Kazmi complained about the above throughout 2005, in January 2006, when she raised the issue to Yu-Ming Wang ("Wang"), an American Asian male, not Muslim, and again to Burke, she was "promoted" to the title she should have had since she started in the position and given the title "Associate" in March 2006, although her job did not change. No retroactive pay was given to correct the under-employment.

20. Kazmi asked for clear lines of reporting and assignment of responsibilities, as she felt that she was being discriminated against in job assignments and reporting compared to her white Caucasian American male colleagues. Details are listed below.

21.    After voicing her concerns, Burke repeatedly alleged several frivolous "insubordination" charges against her, while completely ignoring legitimate acts of insubordination by non-Muslim white Caucasian American males, specifically Brendan Thorpe ("Thorpe") (between November 2005 and June 2006) and Christopher Foster ("Foster") in August 2005, both white Caucasian American males not Muslim.

22.    Burke also frequently used male-oriented sports references in referring to working with the males in the department, such as "swingman" and "utility infielder." Kazmi was unfamiliar with these terms in business, certainly they were not taught in business school. They fostered a male dominated and discriminatory environment, including alcohol drinking outings that they knew she could not participate in as a Muslim (Muslim's do not drink and she chose not to attend events where alcohol was served) and incentives for males to go to sporting games.

23.    Burke also generally created and encouraged an exclusionary environment favoring white American male non-Muslims. Thorpe discussed details of the Harbor I, the Collateralized Mortgage Backed Securities ("CMBS") transaction with Foster and Fiordaliso and deliberately kept Kazmi in the dark, even though she had the most CMBS sector experience and was working on the deal (the only one in the group working on it, Foster and Fiordaliso had not worked on it at all, nor were they part of the CMBS sector).

24.    In a meeting with Wang in February 2006, being demeaning in front of her, Burke called Kazmi a receptionist, secretary, and back office/operations person, while her job description and reviews clearly stated otherwise. According to Foster, at the time that he was interviewing for a job with Wachovia, Burke had specified to him that "Samrah is the person who answers the phones."

25.    At Wachovia, Kazmi attended a mandatory seminar for women only that addressed the way women should dress, the way they should wear their hair and that they should not do things like make their own photocopies, as

5

the message was that women easily run the risk of being thought of as secretaries. There was also a pink book entitled "How Women Get to the Corner Office" (or something of similar title) which indicated things like women should not eat a salad at their desk for the same reason. Men were not expected or required to attend, nor were they advised on what to wear, what to eat so as not to be perceived of as secretaries around the office, showing that women were the subject of stereotyping at Wachovia.

26.  Being treated like a secretary, in February 2006, when New York City/New York State had their worst snow storm of the season and in many years, Foster, who was traveling to California at the time to do a servicer due diligence, called Kazmi at midnight and said that she must fax him a copy of her corporate credit card at the hotel where he was staying. When Kazmi told him that she did not have a fax at home, nor did she have a car, and because it was snowing heavily outside, it would be better if he called Burke or Thorpe both of whom have fax machines at home, he then threatened that if she did not do as he demanded, he would mark her review and file a complaint of insubordination against her. Kazmi went out and faxed a copy of her corporate credit card. Kazmi also thought this was not legal, but she felt threatened.

27.  Burke had said he needed Kazmi to support Foster, she was told it would be with analytics, but instead Foster asked her to answer telephone calls, screen his telephone calls from his wife and make his wife's appointments with her gynecologist.

28.  That same month when Kazmi requested a transfer, Burke and Wang told her that she could not move to another group or be engaged in any activities other than operations because she had poor "communication" skills because of her partially foreign education and "non-American" accent, despite her extensive education which took place in English.

29.  Despite all Kazmi's efforts in the CMBS sector, Burke mentioned to Foster and Thorpe about Kazmi that he "would love to see her fail!", as reported by Foster to Kazmi. However, Burke made compliance

6

exceptions and ignored compliance violations made by Fiordaliso in order
to promote him (middle office employee, not part of the SAI group).

30.  Kazmi properly and as required by firm policy reported several
compliance and procedural remedies that were marginalized because of
the discriminatory environment. In fact, the situation was addressed by
Burke telling Kazmi that she was "too passionate about compliance!" and
that it would "cost" her.

31.  Criticizing Kazmi's female voice and what he deemed "unfeminine
behavior," Burke accused her of "berating" Fiordaliso, while researching
the above issues, because she was strong, assertive and firm in her beliefs.
Men would be similarly strong and assertive, but never criticized. In fact
in Kazmi's email of June 18, 2006, Kazmi specifically stated that
Fiordaliso (disrespectfully and in an abusive and discriminatory manner)
used foul language with her, yet Burke did not address this with
Fiordaliso.  Addressing the issue of verbal abuse towards her was
unwarranted because, according to Burke, Kazmi was a female minority
who "does not deserve respect," as reported to Kazmi.

32.  On July 12, 2006, the conflict between Israel and Hezbollah began in the
Middle East. It was very soon catapulted to international attention and was
widely reported in the news media. During the week of July 17, 2006, as
the conflict was escalating, and members of SAI were watching it on
television, Thorpe, who sat next to Kazmi, fully aware that she is a
Muslim, loudly made the statement: "[a]ll Muslims are terrorists!" Note
that Thorpe was Kazmi's assigned mentor by Wachovia.

33.  During the week of July 17, 2006, Kazmi complained to Burke that
Thorpe made racial slurs towards her as described above. As a result of
her reporting the racial slurs, Burke took absolutely no action towards
Thorpe, in fact stated: "Sam, I really need you to start working with all
team members, not constantly whining and rattling on about them. This is
unhealthy for the team." Burke then told Kazmi that he no longer wanted
her to work with Thorpe in the CMBS sector, so she was disadvantaged in

7

assignments because of the discriminatory environment that was permitted to prevail.

34.   In the office, they again all had the televisions on when CNN was reporting the beginning of the Muslim holy month of Ramadan on September 25, 2006. Knowing full well that Kazmi was a practicing Muslim and that she was observing the holy month of Ramadan on that particular day, Thorpe looked directly at her and said loudly to be heard everyone, "Fucking Muslim holiday! They're all a bunch of brainless barbarians as far as I'm concerned!" Kazmi also heard Thorpe calling Robert Sirleaf, an African American, a "nigger" and constantly referred to Elena Korneeva, a Russian-born female, "KGB." White, American born males did not have any "special" names like this.  No action was taken against Thorpe even though Kazmi recommended to Burke that Thorpe be sent for diversity training. Throughout this period, as described below, Kazmi reported the problems she was experiencing to the Human Resources Department, specifically Jami Wright.

35.   During the week of September 25, 2006, Kazmi told Burke that Thorpe made yet another racial slur at her. In fact, she told Burke that perhaps this was the reason that Thorpe has never wanted to work with her on the CMBS product, because he believes that all Muslims are (as Thorpe stated), "a bunch of brainless barbarians!" Burke told Kazmi to never mention it again or she would face instant termination.

36.   In October 2006, Elena Korneeva resigned in frustration because she "was not learning anything," yet the Middle Office employee, Fiordaliso was being given excessive responsibilities, many of which were causing issues in the lack of performance of his Middle Office duties and status and putting Wachovia and SAI at great risk, as he was not appropriately licensed for activities he was engaging in to promote his career. Kazmi was terminated that month and replaced at her very desk by an American-born, white male, not Muslim with no experience and no licenses.

Male and Caucasian Employees Take Precedence:

37.     Many times, men were given precedence over women for better jobs, titles and assignments. For example:

    a) In early June 2006, also while ramping up the CMBS deal, Harbor I, Burke entrusted the deal analytics to Thorpe (Head of CMBS sector, but licensed for less than six months), yet Kazmi, who was a major part of the CMBS sector, was not given any role to play in this deal, which was the first deal of her sector at Wachovia. Thorpe, a non-Muslim white American Caucasian male.

    b) Despite Kazmi's longstanding trading and portfolio management background (over 11 years in Trading and over 9 years in Portfolio Management) and her knowledge of the CMBS/Commercial Real Estate ("CRE") CDO product and sector, she was not allowed to make one relative value recommendation (despite several credit write-ups prepared by her, they were not once reviewed by Burke, Head of ABS Investment Management Group, nor by Thorpe, Head of CMBS/CRE CDO group). Yet, Fiordaliso, a fresh college graduate hired by the Structured Credit Products' Middle Office group, unlicensed and not a part of SAI, was allowed to run analytics, make relative value recommendations on the RMBS and Consumer ABS sector and approve bonds in the various warehouses. These are also all major compliance and regulatory issues of which Kazmi complained, yet this was encouraged, promoted and tolerated because Fiordaliso is a white American Caucasian male non-Muslim.

    c) Since his hire, Fiordaliso was promoted and groomed for advancement. Kazmi was treated in just the opposite fashion. He was presented to colleagues and clients, not only as a member of SAI, but also as an analyst on the RMBS and Consumer ABS sector, even though he was actually Middle Office. Despite being presented as an Analyst in the CMBS sector by Burke, Thorpe constantly sabotaged

Kazmi's efforts and at times actually told counterparties and sales coverage that she was not even part of SAI. For example, in March 2006, when SAI's sales coverage at UBS changed from Sean Whelan to Claudia Hamilton, Thorpe specifically stated to Hamilton that he (Thorpe) was the only one responsible for the CMBS sector, something later confirmed to Kazmi by Hamilton.

Family Medical Leave Discriminatorily Enforced:

38.    All team members (except Kazmi) took more than their allotted vacation and the firm's "Paid Time Off" policy ("PTO") days without providing any evidence for the need of absence, yet Burke has constantly mocked, made insensitive remarks and outright questioned the legitimate reasons for Kazmi's time off. This was part and parcel of the discrimination against Kazmi, as well as a direct violation of the FMLA on its own.

39.    In February 2005, Kazmi took PTO to take care of her terminally ill mother. The PTO was approved by both Darrell Baber, her manager at the time, and Burke, her immediate supervisor. Yet upon her return, her colleagues, Manish Desai, Anik Ray and Natasha Chen informed her that Burke was extremely upset that she took any time off at all. In fact, Burke was openly suggesting that Kazmi's mother's terminal illness was merely a figment of her imagination and according to Burke, "she is not allowed to ever take a vacation again" and threatened to terminate her or sever her pay if she ever left again.

40.    In May 2006, Burke again had major issues when Kazmi took firm policy allowed Family Care Time ("FCT") to address a personal emergency: her terminally ill mother. Despite providing adequate medical evidence and following all company procedures while applying for FCT, Burke severed her pay during the two weeks that she was on paid FCT. Upon her return on May 30, 2006, she filed a complaint with the Human Resources Department regarding non-payment of her salary. On June 2, 2006, she was told by the Human Resources Department that even though she

should have been on paid FCT, Kazmi's pay had been suspended based on her manager, Burke's, discretion, and would not be reinstated unless and until explicitly approved by him. Ultimately, Human Resources Department contacted Burke and he told Kazmi that if she did not report him, he would immediately have her pay reinstated, which he did.

41.     At the time of Kazmi's termination, Burke said she had "disappeared from the office for several hours during the day on multiple occasions." He was aware that this was untrue. Upon her return in May 2006 from her FCT leave of absence, she specifically explained to him that she would need to work around her mother's illness. She offered to provide doctors' notes; however, Burke specifically reiterated to her in an email in mid-September that she could take as much time as she needed without a doctor's note. Her mother then had one emergency surgery and two emergency room visits, as well as several doctors' visits. Kazmi accompanied her mother because of physical and mental conditions, as well as limited English skills. Burke declined doctors' notes, yet made remarks like, "I just do not buy this story about your mother being ill!" In August 2006, despite having approved FCT, Burke told Kazmi and senior group members that her mother's illness was, "made up" and "all news to me!"

42.     In August 2006, despite Kazmi having 10 additional days in PTO remaining, Burke stated that based on his discretion, she no longer had any more PTO days and the previously taken FCT had been applied towards the PTO. Each of the other team members had far exceeded their allocation of time off and continued to take time off during the holiday season. All other team members including Burke are white Caucasians, non-Muslim.

43.     At the same time, Foster was accompanying his daughter for her admission process in several New York City schools and was absent from the office for several hours during the day on multiple occasions. He was not reprimanded at all. During the week of May 22, 2006, Foster did not show up to work at all and did not inform team members or management,

11

yet absolutely no action was taken against him. Upon his return a week later, he was not asked to provide any reasons for his absence.

44.    Wachovia failed to enforce Kazmi's FMLA rights, although she had filled out all the required paperwork pursuant to the company's policies. Wachovia, through Burke, improperly interfered with her leave, as well as misunderstood the nature of her mother's illness and failed to request medical certification or properly handle questions regarding the leave, ultimately using it in a discriminatory manner. In July 2006, based on a joint decision by Burke, Baber and Wang, Kazmi received a threat of demotion and was told that her compensation under the new position would be negatively impacted. She was also told that if she did not accept the demotion, her job would be threatened. No representative of Human Resources was involved in this matter, nor was it documented in writing.

Licensing Discriminatorily Not Maintained and Solicited:

45.    Kazmi had a Series 65 license since 1998, yet when she joined SAI in August 2004, she was told by Burke that the firm could not hold her license. At the same time told Foster, Thorpe and Korneeva to get the same license that he said the firm could not hold for Kazmi. Burke then took the Series 65 test in 2005 himself. Kazmi's Series 65 was later reinstated because of her request to Brian Moran, Compliance Officer, who stated there were no issues in Wachovia holding her license. Yet another harassing and discriminatory action by Burke, which was reported to Wachovia.

Conferences & Due Diligence for White Caucasian American Males Non-Muslim:

46.    Burke told Kazmi not to attend the free conferences and due diligence meetings held in the New York Metropolitan area, yet has approved on several occasions for Thorpe to travel to California to attend due diligence meetings with Foster. The cost for this was much greater to the firm and the content was irrelevant and inapplicable to the business they were doing, as far as Thorpe's product specialty or skill set is concerned.

Wachovia Did Not Address Complaints but Let the Discriminatory Environment Prevail:

47.  Kazmi gave notice and filed written as well as verbal complaints to Burke on several occasions including January 28, 2006, February 20, 2006, April 3, 2006, May 1, 2006, the week of June 3, 2006, June 18, 2006 and July 17, 2006, yet absolutely no action was taken by him to address the issues she raised (the same issues indicated above). She also filed written and verbal complaints with Wachovia's Human Resources Department Advisor Jami Wright on April 11, 2006, April 30, 2006, June 19, 2006 and September 7, 2006 and Human Resources Department representative, Kelty Kessler-McRae on October 17, 2006.

Termination:

48.  On October 13, 2006, Burke told Kazmi that based on the "strangeness" of her relationship with Thorpe, he would finally separate her from Thorpe and move her workstation two desks away from him.

49.  On October 17, 2006, Kazmi moved to her new workstation at 9:00 a.m. in the morning.

50.  At 5:00 p.m. that same day, Burke terminated Kazmi based on the ambiguous pretext of: "everything that has happened during the year", yet took absolutely no action against Thorpe for his discriminatory and harassing conduct. She was immediately replaced the following day by Nash, a recent college graduate, unlicensed with no industry experience and her Uniform Termination notice was discriminatorily marked with a reason for termination as "Other" to read as follows, for all future employers to see:

> Ms. Kazmi was terminated by the firm because of concerns expressed by her supervisor about her general relationships with her co-workers.  Ms. Kazmi has contested her termination including the validity of the concerns expressed by her supervisor.

51.     As well known generally, to all Muslim women, the most important thing
        is their honor and reputation. Kazmi never behaved inappropriately with
        anyone for this reason, yet her termination statement indicates that her
        "relationships with her co-workers" were suspect.    In the Muslim
        community, this carries an inappropriate and intolerable "sexual"
        connotation. Since Kazmi has always lived by the highest of legal, moral,
        ethical and professional standards, this is very damaging to her, being
        deliberately chosen by or in concert with one that was discriminating
        against her in order to defame her and direct an attack not only on her
        honor and her pristine reputation, but also on her religious beliefs and
        solid faith. The intent was solely to harm her mentally, emotionally,
        religiously and reputationally.

Complainant Replaced by a White Caucasian American Male Non-Muslim:

A Premeditated Longstanding Plan:

52.     There was a longstanding plan by Burke to fire Kazmi.  In March 2006,
        Burke sent Kazmi an email saying that not enough was going on in the
        CMBS sector and that she should help out Foster on the Residential
        Mortgage Backed Securities ("RMBS") and Consumer Asset Backed
        Securities ("ABS") sector.  This was false pretext used to disadvantage
        Kazmi.

53.     In May 2006, Burke then told Kazmi that the RMBS and ABS sectors
        were too crowded and that she should then help Burke on the
        Collateralized Loan Obligations ("CLO") sector.  This was false pretext
        used to disadvantage Kazmi.

54.     On September 29, 2006, Burke explicitly said to Kazmi that he is
        "probably over-staffed"; however, less than a month later, she was
        terminated for very vague and unclear reasons and she was replaced with a
        new hire American Caucasian male, non-Muslim, who was unlicensed and
        had virtually no industry experience, Nash.

14

55.   When Kazmi sought to receive unemployment benefits, initially Wachovia attempted to interfere with the same, indicating that she was "discharged for reasons other than lack of work." That position was later changed and she was entitled to benefits and received them until she was re-employed.

56.   Kazmi was an extremely capable and qualified foreign-born minority female Muslim in the position in which she was replaced by Nash who was hired by Burke. Burke also bent many of Wachovia's Compliance policies and procedures in order to promote an American Caucasian male, non-Muslim, who was clearly less qualified and in the process completely disregarded Kazmi's experience, skill set and qualifications because of her status as a foreign-born minority female Muslim.

57.   Kazmi was terminated in a malicious manner designed to inflict emotional and physical harm on her for no legitimate reason.

58.   Kazmi constantly had severe migraines and went for a brain MRI during this period. Her doctor said that the condition was stress-related and that the job was the main stress that she was having.

59.   Kazmi was terminated for improper reasons related to her status and in retaliation for her complaints as a dark-skinned, foreign-born Asian female Muslim.

60.   Further, men were, as a matter of commonplace within the SAI group, treated better than women. Even men who were terminated were regularly given severance packages, including Burke, as well as men who were terminated "for cause" were given severance packages, which Kazmi was not even offered. In the many above referenced and other ways, Wachovia treated men and women differently at the firm.

## VI.   CONCLUSION

61.   As a result of defendants' conduct, Kazmi has suffered and continues to suffer severe professional, economic and emotional, reputational distress, for which she should be compensated and made whole.

## VII.    CAUSES OF ACTION

### A.    VIOLATION OF TITLE VII:

**First Cause of Action:**

**Gender, Race, Religious and    National Origin Discrimination**

62.    Plaintiff Kazmi realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint.

63.    Defendants engaged in systematic disparate treatment against a protected group was a regular standard operating procedure and caused by purposeful or intentional discrimination. Systematically and statistically, overall, Wachovia treated a female, Muslim, dark skinned and/or foreign born person in a protected group and qualified for her job who was harassed as inferior to white males and discriminated against in employment decisions, replacing her with an inexperienced American born new hire white male not Muslim, an adverse employment action under circumstances that support an inference of discrimination, a motivating factor in Kazmi's termination.

64.    Defendants also discriminated against Kazmi because of her gender, religion, dark skin and foreign born status, failing to see her as an individual professional, but only as a woman, a Muslim, a dark skinned person and a foreigner, in violation of Title VII, 42 U.S.C. Sec. 2000e-2. Title VII prohibits such discrimination, as well as employment decisions that reflect discriminatory stereotyping.

65.    Kazmi has been injured by defendant's intentional violations of Title VII, for which Kazmi has been damaged in an amount, which cannot be readily ascertained and will be proven through expert testimony at trial.

66.    Kazmi has suffered from lost wages, benefits, equity participation, embarrassment, humiliation, fear, physical and psychological illness, attorneys fees, expert witness fees, costs and other compensatory damages.

67.    She is entitled to injunctive relief, back pay with interest, front pay (lost future earnings), attorney fees and litigation costs, as well as punitive damages for Wachovia's intentional actions.

**B.    VIOLATION OF FAMILY AND MEDICAL LEAVE ACT**

<u>**Second Cause of Action:**</u>
**Violation of the FMLA**

68.    Plaintiff Kazmi realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint.

69.    Wachovia violated the Family and Medical Leave Act, 29 U.S.C. Sec. 2601, *et. seq.*, ("FMLA") when defendants discharged Kazmi without just or good cause or without notice.    A private right of action exists for violations of the FMLA.  29 U.S.C. 2617(a)(2); 29 F.R.D. Sec. 825.400.

70.    Kazmi was an eligible employee under the FMLA and can prove entitlement to leave from a covered employer under the FMLA, which Wachovia was, and that the covered employer interfered with the leave entitlement by retaliating against Kazmi for taking leave and reporting the same, a prohibited act and retaliation under the FMLA.

71.    Kazmi may recover money damages, lost wages, benefits, equity participation, embarrassment, humiliation, fear, physical and psychological illness and other compensatory damages.  She is entitled to injunctive relief, back pay with interest, front pay (lost future earnings), attorneys fees, expert witness fees and costs.

**C.     VIOLATION OF NEW YORK STATE STATUTES**

**Third Cause of Action:**

**VIOLATION OF ARTICLE 15 OF THE**

**NEW YORK EXECUTIVE AND HUMAN RIGHTS LAWS**

72.     Plaintiff Kazmi realleges and incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint.

73.     State Human Rights Law, NYS Exec. Law Sec. 296 *et. seq.*("NYHRL"), prohibits discrimination on the basis of age, race, color, sex, national origin, religion, disability, or marital status.

74.     Article 15 of the New York Executive Law was designed to insure every individual within the State of New York "is afforded an equal opportunity to enjoy a full and productive life." NYHRL, Sec. 290.   Equality of opportunity is a civil right and defined to include "employment without discrimination because of age, race, creed, color, national origin, sex or marital status."  See NYHRL, Secs. 29 and 296 and NY Civ. Rights Law, sec. 40c-(2).

75.     Defendants engaged in systematic disparate treatment against females, Muslims, dark skinned and foreign born persons as inferior to white males, although this is and was a protected group, as a regular standard operating procedure and caused by purposeful or intentional discrimination as stated above. Systematically and statistically, overall, Wachovia treated female, Muslim, dark skinned and foreign born persons as inferior to white males.

76.     Kazmi may recover money damages, lost wages, benefits, equity participation, embarrassment, humiliation, fear, physical and psychological illness and other compensatory damages. She is entitled to injunctive relief, back pay with interest, front pay (lost future earnings), attorneys fees, expert witness fees and costs.

**VII.   RELIEF SOUGHT**

102.   As a direct and proximate result of the foregoing acts and omissions of defendants, Kazmi have been injured and seeks the following relief, in the total amount of not less than $570,000:

### A. Damages:

#### 1.  Underemployment & Back Pay

103.   Actual damages, an amount that reasonably compensates Kazmi for any lost wages, bonuses and benefits, taking into consideration any increases in salary and benefits, including pension, that Kazmi would have received while employed and after termination had she not been discriminated against.

#### 2.  Front Pay

104.   Future damages, a monetary amount equal to the present value of the wages, bonuses and benefits that Kazmi would have earned had she not been discriminated against for that period from the date of Kazmi's verdict until the date when the Kazmi would have voluntarily resigned or obtained other employment.

#### 3.  Compensatory Damages

105.   In addition to compensatory damages for lost wages, Kazmi is entitled to recover for emotional distress or mental anguish resulting from defendant's intentional discrimination in view of the nature, character, and seriousness of any pain and suffering is considered as well as its extent or duration.

#### 4.  Punitive

106.   Punitive damages are awarded in certain cases as a punishment and as a warning to others to keep them from following the defendant's example. Kazmi will prove by a preponderance of the evidence that one of the defendant's acts were done with either:

(a) actual malice, that is, intentional wrongdoing -- en evil minded act; or

      (b) a wanton and willful disregard for the rights of another -- in other words, a deliberate act with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of the act.

107.    Punitive damages are not intended to compensate Kazmi, but to punish the defendant and to prevent similar conduct n the future. Thus, the defendant's net worth and the impact of its paying that award must be considered, in reasonable relationship to Kazmi's actual injuries and the attitude of the defendants. Punitive damages under Title VII are on a sliding scale based upon the number of employees in a given employer's workforce, as follows:

| Number of Employers | Maximum |
|---|---|
| 15-100 | $50,000 |
| 101-200 | $100,000 |
| 201-500 | $200,000 |
| 501 or more | $300,000 |

### 5.    Attorneys/Expert Witness Fees:

108.    The court may award reasonable attorneys' fees to the prevailing party under Title VII. See Sec. 2000e-5(k). Further, for cases under the Civil Rights Act of 1991, the prevailing party may recover expert witness fees. Pub. L. No. 102-166, Sec 113, 105 Stat. 1071, 1079.

### 6.    Interest

109.    Plaintiff Kazmi seeks interest compounded annually at the rate of 10%., or the then lawful rate, to be assessed at the time of the trial.

**WHEREFORE**, Plaintiff Kazmi demands judgment against defendants with compensatory damages in a sum in excess of $870,000, with punitive damages plus interest, an award of reasonable attorney's fees, expert witness fees, and costs.

Dated: New York, New York
    February 21, 2008

Respectfully submitted,

MALECKI LAW

Jenice L. Malecki, Esq. (JLM-2871)
*Attorney for Plaintiff*
***Samrah Kazmi***
11 BROADWAY, SUITE 715
NEW YORK, NEW YORK 10004
(212) 943-1233 TELEPHONE
(212) 943-1238 FACSIMILE

21

EEOC Form 161-B (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Samrah Kazmi**<br>300 West 55 Street<br>Apt. 15-W<br>New York, NY 10019 | From:  **New York District Office**<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

☐  On behalf of person(s) aggrieved whose identity is
  *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2007-02151** | **Hazel C. Stewart,**<br>**Supervisory Investigator** | **(212) 336-3776** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

[ ]  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____     11-28-07

**Spencer H. Lewis, Jr.,**
**Director**

*(Date Mailed)*

Enclosures(s)

cc:

| | |
|---|---|
| Dan McNatt<br>VP HR Compliance<br>WACHOVIA BANK, LLC<br>100 North Main Street<br>Winston-Salem, NC 27150 | Jenice L. Malecki, Esq.<br>Malecki Law<br>11 Broadway, Suite 715<br>New York, NY 10004 |

# EXHIBIT A